UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERIC STUBBS,<br><br>             Plaintiff,<br><br>     v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>             Defendant. | Civil Action No. 2:09-cv-3145 (SDW)<br><br><br><br>OPINION<br><br>April 26, 2010 |

**Wigenton, District Judge,**

    Before the Court is Plaintiff Eric Stubbs's appeal of the final administrative decision of the Commissioner of the Social Security Administration ("Commissioner"), with respect to Administrative Law Judge Joel H. Friedman's ("ALJ") denial of Stubbs's claim for disability insurance benefits ("DIB") under Sections 216(i) and 223(d) of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), and for supplemental security income ("SSI") benefits under Section 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. § 1382c(a)(3)(A).  This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  The Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Venue is proper under 28 U.S.C. § 1391(b).  For the reasons stated herein, this Court AFFIRMS the Commissioner's decision.

**I.     Background and Procedural History**

    Stubbs was born on November 15, 1961, was forty-one years old at the time of the filing, and has completed schooling up to the eleventh grade.  Plaintiff filed applications for DIB and

1

SSI on October 22, 2003.  His claim was denied initially and upon reconsideration.

A.     *Medical Treatment Records*

Prior to his alleged disability onset date of October 14, 2003, Stubbs was treated at University Hospital for back pain and non-acute gout.  On September 30, 2003, Stubbs was treated at University Hospital for an acute gouty arthritis attack with reported pain in the right wrist, elbows, knee, and hip.  At that time, Stubbs stated that his last gout attack had been six months prior.  In addition, he admitted to drinking beer and eating red meat, and had not been compliant with his medication or diet restrictions.  Stubbs was given medication to treat the gout and was scheduled for additional treatment in the rheumatology clinic.  Stubbs was again treated at Rhomur Medical Services ("Rhomur") for gout attacks and synovitis in November 2003.  Stubbs reported in November 2003 that he had stopped drinking six weeks prior to the treatment.

In February 2004, Stubbs was examined at Rhomur and his gout was found to be stable.  Also during that month, Dr. Michael Leibowitz conducted an orthopedic disability examination of Plaintiff.  Stubbs complained of pain, swelling, and stiffness in both the left ankle and right wrist, but stated that the gout medications alleviated his pain.  Stubbs denied using any assistive devices and none was used during the examination.  His hand and finger dexterity were intact, grip strength rated a 4+5/5 for the right hand and 5/5 on the left, and bilateral range of motion was full in the forearms and wrists.  Stubbs's lower extremities had limited ranges of motion and parts were found to be tender, warm, or inflamed.  The prognosis at the time was poor with moderate restrictions for standing, bending, ambulating, and squatting, and mild to moderate restrictions for activities requiring full range of motion and strength in the right wrist and hand.

On March 25, 2004 and July 9, 2004, the State's medical consultant, Dr. R. Briski, conducted physical residual functional capacity assessments of Stubbs and found that he could

lift and carry ten pounds frequently and twenty pounds occasionally; stand and walk for two to three hours a day; sit with normal breaks for about six hours in an eight hour workday; occasionally perform postural activities with no limitation for manipulative activities; and push and/or pull unlimitedly other than the lift and carry limitations.

Between March 28, 2005 and October 28, 2005, Stubbs was treated on multiple occasions for non-gout conditions. During this same period, the record indicates Stubbs drank a six pack of beer daily and had been using cocaine. Stubbs was also "trying to get disability for his gout" during these visits.

On November 11, 2005, Stubbs was treated for acute gouty arthritis in the left hand and elbow. At that time, he reported that his last acute attack was in July 2004 and he was advised by doctors to abstain from drinking any alcohol. However, the treatment record indicates that on December 5, 2005, when Stubbs again sought treatment for gout, he had been drinking up until one week prior to the treatment and had not been taking his medication. He had also refused to undergo arthrocentesis treatment and said he was "trying for disability."

On January 20, 2006, Monica Chomsky, an advance practice registered nurse who treated Plaintiff at Rhomur, performed a physical for the purpose of completing the Medical Source Statement of Ability to Do Work-Related Activities. She found that Stubbs's right knee was slightly swollen, with 170 degrees flexion and 75 percent flexion without pain. She also opined that the left knee was 95 percent improved; range of motion was 100 percent with minimal pain; and that Plaintiff's fingers had no problems. In addition, he could lift up to twenty pounds frequently; stand and walk for less than two hours a day; climb and balance occasionally; and sit without limitations. However, his ability to push and pull was intermittently limited in both the upper and lower extremities and he could not kneel, crouch, crawl, or stoop. Nurse Chomsky

also found that Stubbs also has no manipulative limitations except performing gross and fine manipulations during acute gout attacks.

On April 18, 2006, Plaintiff was treated for recurrent gouty arthritis. Stubbs was found to be drinking again and was advised to modify his diet and lower his alcohol intake. The gout was much improved during review of his medical tests in May 2006. However, Stubbs continued to drink up to one quart of beer daily.

On April 26, 2007, Stubbs received treatment for gout symptoms in his left wrist. A physical examination showed minimal swelling and unremarkable x-rays. Stubbs's gait was steady, range of motion in the musculoskeletal system was full, and pulses were 2+ and strong. Stubbs was again drinking alcohol prior to the gout attack. Stubbs was instructed to follow up with rheumatology treatments.

Stubbs again sought treatment at University Hospital for pain in his right elbow and hand on October 24, 2007. He reported he had run out of his gout medication and had been drinking alcohol prior to the gout attack. Stubbs received an injection of Toradol and his prescription for gout medication was renewed.

During an April 2008 hospital visit, Stubbs was ambulating with crutches obtained from an unrelated accident and presented a form for disability secondary to gout. The physician found no swelling, effusion, or palpable tenderness in his right knee, and refused to complete the form. Stubbs was advised to take his medication.

On May 20, 2008, Dr. Dyana Aldea, a State appointed orthopedic consultant, examined Stubbs. Plaintiff complained of right knee and foot pain secondary to gout. Dr. Aldea found he could lift and carry up to ten pounds continuously, up to twenty pounds frequently, and up to fifty pounds at least occasionally and sometimes frequently. In addition, he could sit for three

4

hours at a time and five hours in a day and stand one hour continuously and two hours total in a day.  Dr. Aldea also opined that he can shop; travel without a companion for assistance; walk a block at a reasonable pace on rough or uneven surfaces; use public transportation; prepare a simple meal and feed himself; and care for his personal hygiene.  Stubbs could also use both hands continuously for reaching in all directions, and could handle, finger, feel, push, and pull.  Stubbs could also use his right foot occasionally and left foot continuously.  Although Stubbs arrived with crutches to the examination, Dr. Aldea found crutches were not medically necessary.  Stubbs may require auxiliary aid for ambulation during gouty attacks but not crutches.  The prognosis was "fair."

B.   *ALJ Hearing Testimonies*

A timely request for a hearing was filed and a hearing was held before the ALJ on March 1, 2006.  On January 25, 2007, the ALJ issued an unfavorable decision.  The Appeals Council vacated the ALJ's decision and remanded the case for further proceedings.   A second hearing was held before the ALJ on August 7, 2008.

At these hearings, Stubbs testified that he had mostly worked in construction, housekeeping, and maintenance.  According to Plaintiff, he suffers gouty arthritis and pain for two weeks out of the month.  He was never treated by a specialist, nor followed up his hospital visits with rheumatology treatment as directed.  The attacks affect his hands and fingers, elbows, knees, and feet, which are tender to the touch.  Plaintiff also indicated that his back pain interferes with his ability to sit.

Stubbs testified that he gets "a little drowsy" while on medication.  Consequently, he choose not to take the gout medication until he felt the gout was "trying to flare" up due to the side effect.  When not experiencing acute gout attacks, he can go grocery shopping on his own;

do household chores; lift about ten pounds without having any problems; walk half a block and back; sit for one hour at a time; and stand for one hour at a time.

During the 2006 hearing, the ALJ noted Stubbs did not require any assistive device for ambulation and was not limping at all.  Stubbs also stated he does not need crutches when not experiencing gouty attacks.  At the 2008 hearing, Stubbs walked without crutches from the waiting room toward the hearing room before his attorney reminded him to take his crutches, upon which he walked back to get the crutches on his own.  Stubbs then testified that he could not walk down the hallway without the crutches.

Also during the 2008 hearing, Stubbs stated that he had just completed a computer training program at Essex County Community College.  He attended that program seven hours per day for a total of three weeks and used public transportation to and from the college.

Patricia Sasona, a vocational rehabilitation specialist, also testified during the 2008 hearing.  Ms. Sasona stated that if the ALJ were to find Plaintiff's testimony fully credible, "he would not be able to perform any of his past relevant work and he would not be able to perform any job in the open economy."  However, she also opined that Plaintiff could work as a small parts assembler or packager if he were able to "use his hands for fine manipulation and gross manipulation on a frequent but not constant basis"; were "able to stand and walk two hours in an eight-hour day and sit for at least six"; and could lift and carry ten pounds.  According to Ms. Sasona, approximately 1600 small parts assembler jobs and 2500 packager jobs exist regionally.

On March 2, 2009, the ALJ issued a decision denying Stubbs's claim.  The Appeals Council found no grounds to review the ALJ's second decision.  This action was thereafter commenced.

6

## II. Standard of Judicial Review

In reviewing the ALJ's decision, this Court must determine whether substantial evidence supports the ALJ's decision. 42 U.S.C. § 405(g). A reviewing court must uphold the ALJ's factual decisions where they are supported by "substantial evidence." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The reviewing court must consider the totality of the evidence, but the court may not "weigh the evidence or substitute [it's] own conclusions for that of the fact-finder." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). This standard "is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## III.   Discussion

The Social Security Administration articulated a five step process for evaluating disability claims. *See* 20 C.F.R. § 404.1520. First, the ALJ considers whether a claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (b). If not, the ALJ considers in the second step whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520 (c). If the claimant suffers from a severe impairment, the third inquiry is whether that impairment meets or equals the severity of a qualified impairment listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P ("Listing of Impairments"), which results in a presumption of disability, and the evaluation ends at this stage. 20 C.F.R. § 404.1520(d). If the claimant does not suffer from a listed impairment or its medical equivalent, the ALJ assesses in the fourth step whether the

claimant has the residual functional capacity to perform his past work.  20 C.F.R. § 404.1520(f).  If the claimant cannot perform his past work, then the final step is to determine whether there is other work that exists in significant numbers in the national economy that the claimant, given his medical impairments, age, education, past work experience, and residual functional capacity, can perform.  20 C.F.R. § 404.1520(g).

With respect to steps one, two, and four of the disability analysis, the ALJ found and the parties do not dispute, that Stubbs has not engaged in substantial gainful activity since October 14, 2003; Stubbs has suffered a severe impairment involving gouty arthritis that meets the C.F.R. standard; and Stubbs does not retain the "residual functional capacity" to perform his past relevant work.  This Court must consider whether the ALJ properly determined that (i) Stubbs's impairments did not meet or medically equal the criteria specified in the Listing of Impairments and (ii) whether substantial number of jobs exists in the regional and national economy for people with Stubbs's age, education, past work experience, and residual functional capacity.

**Step Three Analysis**

The courts require an ALJ to "fully develop the record and explain his findings at step three, including an analysis of whether and why each of claimant's impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments." *Rivera v. Comm'r of Soc. Sec.*, 164 F.App'x 260, 263 (3d Cir. 2006) (quoting *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000)).  Although conclusory statements alone cannot adequately support an ALJ's holding, should there be substantial evidence on record to support the ALJ's findings, such conclusory statements are harmless.  *Id*.

Here, the ALJ found:

"based on the evidence discussed herein, [the claimant's gouty arthritis does not]

8

> satisfy [..] the criteria of Listing 14.09[1] for inflammatory arthritis in that there is no evidence that it has resulted in an inability to ambulate effectively, or to perform fine and gross movements effectively (14.09[A]) or that it meets any of the criteria noted in the other subsections of that listing."

[(AR. 18-9.)]

Whether an individual's impairment or combination of impairments meets or equals the level of severity described in the Listing of Impairments must be demonstrated by recorded medical facts such as judgments about medical equivalence furnished by state designated physicians, and contrary evidence such as failure to follow prescribed treatment without a justifiable reason. Social Security Ruling 86-8, SSR 86-8, 1986 Lexis SSR 15. Medical equivalency cannot be established solely by Plaintiff's complaints of symptoms. *Id.* Listing 14.09 states:

> The spectrum of inflammatory arthritis includes a vast array of disorders that differ in cause, course, and outcome. Clinically, inflammation of major peripheral joints may be the dominant manifestation causing difficulties with ambulation or fine and gross movements; there may be joint pain, swelling, and tenderness. The arthritis may affect other joints, or cause less limitation in ambulation or the performance of fine and gross movements. However, in combination with extra- articular features, including constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss), inflammatory arthritis may result in an extreme limitation.
>
> . . .
>
> The criterion is satisfied with persistent inflammation or deformity in one major peripheral weight-bearing joint resulting in the inability to ambulate effectively (as defined in 14.00C6) or one major peripheral joint in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7).

[20 C.F.R. Pt. 404 Subpt. P, App. 1 §14.09.]

Contrary to Plaintiff's assertion that his symptoms support a finding of the required level

---

[1] 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 14.09 shall hereinafter be referred to as "Listing 14.09."

9

of severity, the testimony, diagnostic findings, and treatment history offer substantial evidence to support the ALJ's determination that Stubbs's impairments do not meet the level of severity required for inability to ambulate effectively as defined in Section 14.00C6$^2$. During the 2006 hearing, the ALJ noted that Stubbs did not require any assistive device for ambulation and was not limping at all. Stubbs also stated that he does not need crutches when not experiencing gout attacks. During the 2008 hearing, Stubbs walked without crutches from the waiting room toward the hearing room before his attorney reminded him to take his crutches, upon which he walked back to get the crutches on his own. Stubbs then testified he cannot walk without the crutches.

Moreover, the medical record indicates that Stubbs did not use and denied using an assistive device for ambulation during the consultative orthopedic evaluation by Dr. Leibowitz in 2004. Although Stubbs ambulated on crutches during two separate examinations in 2008, the physicians specifically indicated the crutches were not medically necessary and found he had full range of motion and there was no swelling, effusion, or tenderness in the knee. Dr. Aldea also concluded that Stubbs is capable of carrying out activities of daily living alone, walk for one hour per day, and walk two blocks without an assistive device. Moreover, medical examinations show that Stubbs's neuro-sensation and motor functions are intact, his muscle power is intact with respect to his left lower extremities, and his gait and station are noted to be unencumbered during treatment visits. Stubbs also commuted to and from community college five times per week for computer training without an assistive device. Therefore, the ALJ's finding that

---

[2] The inability to ambulate effectively as required for Listing 14.09 has the same meaning as in Section 1.00B2b, which "means an extreme limitation of the ability to walk; i.e., an impairment() that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.00B2b(1). "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" and "have the ability to travel without companion assistance to and from a place of employment or school." *Id.*

10

Plaintiff's impairment is inconsistent with the required level of severity under Section 14.00C6 is affirmed.

Further, Stubbs claims that he had difficulty with fine and gross manipulations as defined by Section 14.00(C)(7)[3]. The record again fails to support Stubbs's contentions. Dr. Leibowitz found Plaintiff retained full range of motion of forearms and wrists bilaterally; full hand and finger dexterity; and no sign of joint inflammation, effusion, or instability. Dr. Aldea observed that Stubbs could dress and undress himself; had full bilateral range of motion in the upper body; had full bilateral grip strength and pinch strength; and his sensation was intact for light touch and pinprick over all four extremities.

While Nurse Chomsky and Dr. Leibowitz's assessments noted Stubbs is limited in handling and fingering as well as pushing and pulling activities during acute exacerbations of gout attacks, the ALJ found the frequency of the attacks are less than Stubbs claims. In contrast, Dr. Briski found Stubbs has no manipulative limitations and was unlimited for push and/or pull activities including operation of hand controls. Dr. Aldea similarly concluded Stubbs could carry out activities of daily living; perform fine and gross manipulations with no limitations using his upper extremities for repetitive fine motor activities; and use both hands continuously for reaching in any direction, handling, fingering, feeling, pushing, and pulling.

When conflict in evidence exists, an ALJ "may choose whom to credit," but may not "reject evidence for no reason or for the wrong reasons." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). In light of the evidence in the record, the ALJ sufficiently explained the weight he give to Dr. Aldea's opinion because the "restrictions noted by Nurse Chomsky and Dr.

---

[3] The inability to perform fine and gross movements effectively as required for Listing 14.09 has the same meaning as in 1.00B2c, which "means an extreme loss of function of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c. 'To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." *Id*.

Leibowitz are not supported by the objective findings or the record as a whole." AR. 24; *see also Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981) ("The ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice."). Furthermore, reliance on Dr. Briski and Dr. Aldea's opinions is appropriate because State agency medical consultants are qualified experts to make findings of fact on the severity of an individual's impairments. Social Security Ruling 96-6p, SSR 96-6p, 1996 Lexis SSR 3.

Contrary to Stubbs's assertion that his subjective symptoms are supported by the medical records and rise to the required level of severity, these records suggest, rather, that Stubbs, with the assistance of arthritis medication and abstinence from alcohol use, does not require the use of crutches for ambulation nor is limited in performance of fine and gross manipulation to the extend specified in Listing 14.09[4]. *See* Social Security Ruling 86-8, SSR 86-8, 1986 Lexis SSR 15. This Court finds abundant evidence in the record and extensive discussions in other sections of the ALJ's opinion supporting the position taken by the ALJ with comparatively little contradictory evidence. Consequently, the ALJ's finding that Stubbs's conditions are insufficient to satisfy the required level of severity for Listing 14.09 is supported by substantial evidence and the ALJ's conclusory statements under step three are harmless.

**Step Five Analysis**

In assessing a plaintiff's ability to work, the Third Circuit has held that subjective

---

[4] The ALJ also concluded that Stubbs's complaints and limitations were exacerbated with his continued alcohol abuse and noncompliance with treatment. (AR. 22.) When Stubbs reduced his alcohol intake and was compliant with diet restrictions and medications, his gout was stabilized and symptoms were alleviated. Stubbs also refused treatment for his gout because he wanted disability and sought disability secondary to gout even when he was not being seen for gouty arthritis. Although his treating physicians referred him to rheumatology clinics, the record contains no evidence that Stubbs pursued that line of treatment.

complaints of pain must be considered and may support a finding of disability. *Green v. Schweiker*, 749 F.2d 1066, 1070 (3d Cir. 1984). However, such complaints, "without more, do not in themselves constitute disability." *Id*. An ALJ must weigh testimony as to pain or other symptoms against the objective medical evidence. 42 U.S.C. § 423 (5)(A). When a claimant complains of pain and establishes the existence of a medical impairment that could reasonably be expected to produce the pain, "the ALJ must determine the extent to which [the plaintiff] is accurately stating the degree of pain or the extent to which he […] is disabled by it." *Milano v. Comm'r of Soc. Sec.*, 152 F.App'x 166, 170 (3d Cir. 2005).

In making the determination, the ALJ may consider (1) daily activities; (2) the duration, frequency, location, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the "type, dosage, effectiveness, and side effects of any medication…taken to alleviate [the] pain or other symptoms"; (5) "treatment, other than medication […] received for relief of [the] pain or other symptoms"; (6) any other measures used to relieve the pain or symptoms; and (7) "other factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 416.929(c)(3). Although the ALJ has an affirmative duty to consider Plaintiff's subjective complaints, the ALJ may reject the subjective complaints as not credible when they are inconsistent with the objective medical evidence, claimant's own testimony, or other evidence on the record. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d. Cir. 1999).

In the present case, the ALJ referred to Plaintiff's testimony of symptoms and limitations. The alleged incapacities include gout attacks two weeks out of the month; inability to lift more than ten pounds at a time; the need for crutches; inability to stand or sit for more than one hour; and drowsiness from medication. The ALJ then contrasted Plaintiff's testimony with the

13

evidence in the record and concluded the testimony is inconsistent with the record and that Plaintiff's claimed pain and functional limitations were "far in excess of those that would reasonably be consistent with objective medical evidence."

The ALJ properly found Stubbs's daily activities consistent with the full range of sedentary work. The ALJ pointed to Dr. Aldea's opinion that Stubbs can perform a variety of routine daily activities, and use his hands for manipulation. Despite claims of significant daily pain, Stubbs attended a three week computer training course at a local college using public transportation, where he had to sit for seven hours a day and use his hands dexterously. As discussed *supra*, the ALJ also observed exacerbation of Stubbs's arthritis through routine alcohol abuse over long periods, stabilization of Stubbs's symptoms when taking prescription medication as directed, and Stubbs's refusal of medication and treatments to obtain disability. Although Plaintiff has complained of medication induced drowsiness, the record does not suggest the drowsiness is so severe as to present a serious functional limitation and is therefore not disabling. *See Burns*, 312 F.3d at 131 (holding that drowsiness is a frequent side effect of taking medication, it should not be viewed as disabling unless the record references serious functional limitations).

In addition, the ALJ found the frequency of Stubbs's arthritis attacks is also not credible. The record from September 2003 and November 2005 indicates Plaintiff went six months to over a year between gout attacks, and there is a history of little or no treatment in 2006 and 2007. Plaintiff also failed to mention problems with his hands during the orthopedic consultative examination, which was found to be normal. The credibility of the severity of Stubbs's claimed pain, dysfunction, and other impairments are undermined because Stubbs offered no explanation as to why he refrained from seeking regular medical treatment for the claimed disability. *Newell*

*v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) (holding a lack of contemporaneous medical evidence is not dispositive if the claimant provides an adequate explanation for the failure to seek regular medical treatment for the time in question).

Indeed, the consultative evidence further supports the ALJ's findings of Plaintiff's residual functional capacity. State agency medical consultants Dr. Briski and Dr. Aldea, and Nurse Chomsky all opined Stubbs could lift, stand and walk, and sit for greater duration than Plaintiff's testimony suggested. Evaluations indicate that Plaintiff can perform occasional postural activities, unlimited pushing and pulling activities, and has no manipulative limitations. This Court notes that Nurse Chomsky's opinion differed in that she indicated that Plaintiff is limited in performing gross and fine manipulations during acute gout attacks. However, the ALJ determined that the frequency of the attacks is less than Stubbs claimed.

The ALJ also used a vocational expert to determine Plaintiff's ability to work. A vocational expert's testimony can be considered substantial evidence if "the question[s] accurately portray[] the claimant's individual physical and mental impairments." *Burns*, 312 F.3d at 123. "Fairly understood, [the] reference[] to all impairments encompass only those that are medically established … [which] means that the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations," not every alleged impairment. *Rutherford*, 399 F.3d at 554.

The Code of Federal Regulations states that a vocational expert may provide reliable evidence regarding the existence of jobs in the national economy that a claimant with particular functional limitations could perform. *See* 20 C.F.R. § 404.1566. The Third Circuit has held the testimony of a vocational expert based on the claimant's credibly established limitations qualifies as substantial evidence. *Covone*, 142 F.App'x at 587. In addition, there is no single number

which is to be the boundary between a "significant number" and an "insignificant number" of jobs. *Johnson v. Comm'r of Soc. Sec.*, 2008 WL 4372786 at 17 (D.N.J. 2008), 2008 U.S. Dist. LEXIS 71638 at 52 (D.N.J. 2008) (citing *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988); *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992)).

Here, Stubbs's argument rests on the lack of explicit explanation by the ALJ as to what constitutes a "significant number" of jobs, and the small percentage of the total number of jobs available to Stubbs in Northern New Jersey and nationally. "When testimony is provided that a significant number of jobs exists for which a claimant is qualified, it is immaterial that this number is a small percentage of the total number of jobs in a given area." *Johnson*, 2008 WL 4372786 at 17, 2008 U.S. Dist. LEXIS 71638 at 53; *see also Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (holding that 200 jobs in the regional economy can represent a significant number of jobs). Therefore, this Court concludes that 1600-2500 jobs in the regional economy and 449,000-919,000 jobs in the national economy, constitute a significant number of jobs. The ALJ's finding that Stubbs could perform a significant number of jobs is supported by substantial evidence.

### III. Conclusion

For the foregoing reasons, the Court holds that substantial evidence supports the ALJ's decision. Accordingly, the Court **affirms** the judgment of the ALJ.

**SO ORDERED.**

s/Susan D. Wigenton
U.S.D.J.

Orig: Clerk
Cc: Parties

16